Good morning, Your Honors. May it please the Court, my name is John Dillingham, and I represent Daniel Timothy and Michael Beyle, who are the appellants to this action. A threshold question applicable to any contractual dispute is the identity of the contracting parties. Remedies and relief in a breach of contract action can only be afforded for and against the parties to a contract. And that principle is no less compelling when the disputed issue is whether arbitration of the dispute is contractually mandated. The initial question — Isn't it also necessary that the parties have standing here to bring a lawsuit? Yes, sir. These people are shareholders in Beyle Corporation or Bell Corporation, right? That's correct. And what they're basically suing for is lost profits? Not completely, Your Honor. They're also suing for other damages that relate uniquely to them arising out of the various torts that they've alleged. The district court didn't reach the standing issue or the other issue regarding whether these were derivative claims. Would you — well, this doesn't appear to be a derivative lawsuit, does it? If they made a demand upon the board of directors, the board of directors would have said, let's go sue them. And, in fact, the corporation is seeking a remedy, isn't it? The corporation is seeking a remedy in the First Amendment complaint. The district court — that matter has been — If the corporation gets its remedy, these people have no complaint. Is that correct? Not completely. There are certain aspects of their damage claim that are totally independent of the lost profits claim that the corporation would have. What aspect is it? Certain aspects of emotional distress and anxiety relating to the — all of the ramifications of the — their reliance upon the false representations that were made by the — They're suing for emotional distress? That is one of the elements of the — Would you suggest, then, Counselor, that a stockholder who was made out poorly in the stock market can bring an action for emotional distress because he lost his money? No. Not unless there were certain tortious acts performed by a defendant that directly gave rise to certain of those — those damages. In this particular case, Your Honor, it is undisputed that the Beal brothers were not individual signatories to the 1997 master construction agreement with Cox, and therefore, that they did not agree to arbitrate their claims of promissory estoppel fraud or negligent misrepresentation. Yet Cox seeks to compel the brothers to arbitrate, contending there are stops from avoiding arbitration or that traditional agency principles require them to arbitrate. The contract was — was what? It was a — describe what they were supposed to do under the contract or what the company, corporation was supposed to do. The master construction agreement between Cox and Beal Brothers Corporation was a contract whereby Beal Brothers was acting as a subcontract to various installations for Cox to provide cable services, eventually telephone services, to residential customers. And the — and the — the Cox would give work orders to? Cox would issue work orders to the corporation that would require the corporation to install various services at various residential sites, yes. And so the — the representations that you're talking about, are they not representations that they would give more work orders? Not precisely. And that's a good question because I think that is a — that is an important aspect for this Court to consider. The master construction agreement was entered into in August of 1997. It was signed by Dan Beal as vice president of the corporation. The representations which form the basis of this particular claim of these individuals arose out of representations, extra-contractual representations, made three and four years later by Cox representatives to the — You're saying extra-contractual. They still had the relationship under the contract, didn't they? Weren't they still working under the contract? Yes. Yes. But I would submit that this — these representatives — It's your position that they were extra-contractual. Yes. That's the issue. Yes. And I think this is very similar to the Intergen v. Greena case, which was decided by the First Circuit, where there were — there were extra-contractual representations made to Intergen, which was a non-signatory to the arbitration agreement. Intergen then filed an action based on the exact same theories, promised — They're talking — isn't — isn't Coxcomb talking to the same people who signed the contract as — on behalf of the corporation? The record's not clear on — on — on whether the representations were made to one of the brothers or all of the brothers. But they were all shareholders, and they were one of them signing it. The problem you have under the contract, of course, is Clause 2.2, which says that there are no guarantees of any particular amount of work, if any. So how can you get around that by simply saying, well, you were talking to me in my individual capacity, but not my corporate capacity, when it's only through the corporate capacity that the construction work is accomplished? That's a good question, too, Your Honor. And I think there's two aspects to that. First is — is the timing. The — the master construction agreement and the provision that you're referring to was entered into in 1997. As a matter of fact, what happens is, when — when these construction agreements are entered into, these subcontractors are — are given a certain designated geographical area within which they're going to do their scope of work and in which they're going to get their work orders. What happened four years later was the — the Cox representatives went to the individual brothers — and this is a closely-held corporation — and said, if you guys invest your personal resources and — and get this additional equipment, we will give you all new territories and — and expand the area within which we will provide you work. And — and they relied on those representations. And those representations had nothing to do with the original contract. Those representations had to do with assurances by Cox that if these brothers invested their own personal assets to expand things, that they would then, through their corporation, be given an expansive territory. And that's part of the — that's part of the issue that — that — that was before the district court. And we — Kennedy, but they're investing in their corporation. Yeah. Well, they're making — well, not — it wasn't investing in their corporation. They signed personal guarantees on equipment leases in order to get the equipment that Cox — And the leases were leased by — the equipment was leased by? The equipment was leased by the corporation and guaranteed by the individual brothers based upon the representations that were made. Very common. Isn't that usual? Yes. Yeah. That — that concept is very common. But the circumstances under which this occurred, we're not suggesting this isn't a — a common scenario. What we're simply suggesting is that as non-signatories, the Beal brothers cannot be compelled to arbitrate their individual claims because there's no principle that would compel them to do so. The First, Second, Third, Fifth, and most recently this circuit in the Comer decision have held there's a big difference between a circumstance where a signatory is seeking to compel a non-signatory to arbitrate and a situation where a non-signatory is seeking to compel a signatory to arbitrate. And — and that's the — the gap that the district court missed in this case. Okay. There is — there is simply no basis upon which to say that these individual brothers, as non-signatories, can be compelled to arbitrate, either under principles of estoppel or under traditional agency principles. All right. You have about a minute and a half left if you want to reserve some time. I think I will reserve time, Your Honor, just to answer any additional questions you may have after counsel's argument. Thank you very much. Thank you. Good morning. May it please the Court. My name is Matt Durstein, appearing on behalf of the appellant, Coxcom Inc. The Beals can't have it both ways. They can't assert the claims, the state common law claims of breach of contract, promissory estoppel, fraud, et cetera, that are all founded — squarely founded on the terms of the master construction agreement between their corporation and Cox, and yet at the same time contend that they're not bound by the arbitration clause contained in that agreement. Part of their claim, as I understand it, though, is that they were promised alterations in or additions to the existing contract. So how does — if — to the extent that their claims are claims that — not that the existing contract's terms should be followed, but that new additional things were agreed to, how does that affect the analysis? The contention of a — I guess to use your additional terms, the claims are all founded on two basic allegations. One, Cox promised us more work in different geographic areas. That is, Cox promised BBC more work. Cox promised to pay us timely and then made some misstatements about paying us timely. All those claims are — squarely arise from the NCA, the master construction agreement. All the additional work, and the Court properly used the term, the square allegation in the complaint, the amended complaint of the district court, is Cox promised additional work orders if BBC obtained more equipment, more manpower. Well, that additional work — the work orders is a defined term under the NCA. All the work that Cox has done, has ever done, and would do in the future is governed by that master construction agreement containing the arbitration clause. So this promise, and the Court, again, cited to the appropriate provision, this kind of claim about Cox, you promised us additional work, or a certain amount of work, or work in a specific geographic area, is contemplated, is anticipated by the NCA. And there is a specific provision that deals with that. So for the appellate — Well, there's a specific provision that deals with it by saying that there are no such promises. Right. And so I guess one way to view it is that they have claims that are under the contract, but they necessarily must fail because the contract says there are no promises. The other way to read the complaint is that a new and different agreement was made that there were promises about the amount and placement and so forth of work, contrary to and supplementary to the terms of the original contract. Well, certainly that is appellant's contention that there was a new promise made for additional work. It seems to me the critical issue is, is that claim, does that claim arise from the master construction agreement? Would that additional work? Was it related to the master construction agreement? Were these claims? Do they arise from? Are they founded on the MCA? And they certainly are. That's one question. The second question, though, and the one that to me seems to be the question to be answered, is that the nature of the claims themselves may be arbitrable, but the question is whether the individuals who seek to raise those claims are bound by the promise to arbitrate, which is an identity of party rather than identity of issue question, and under what principles would the shareholders of a closely held corporation be bound by the corporation's arbitration promise? You're precisely correct, and the district court so found that these claims, indeed, are arbitrable. But why? That's what I'm asking. Why are these people required to arbitrate these claims? The claims, because the claims asserted by the corporation are arbitrable. They fall within the call of the arbitration agreement, and whether asserted by the corporation or the individuals, the question, as you correctly point out, is should the non-signatories be bound as their corporation is bound to arbitrate those claims? And here, the district court properly applied equital estoppel to find that they are bound. Okay. Why, though, explain to me why these non-signatories should be bound to arbitrate, even though they did not sign the promise to arbitrate. This Court and the other circuit courts have recognized essentially two types of estoppel that will bind a non-signatory. One is, I think it's been referred to as intertwined estoppel. That form of estoppel theory has only been applied to bind a signatory to arbitrate its claims against a non-signatory. That is, if the signatory signed an agreement that contains an arbitration clause, and it is asserting claims against a non-signatory that are intertwined with the agreement that contains the arbitration provision, under those circumstances, courts always apply or have found that it's a non-signatory. And that's not our situation. Not our situation. That would be cops suing them. Correct. All right. Okay. Our situation is the second type, oftentimes referred to as direct benefits estoppel. And there is a series of cases out of all the circuit courts, and this Court recently self-recognized this theory and the application of it in Comer, a decision that we submitted under 28J, submittal to the Court. Although it came out the other way. In fact, the individual is not required to arbitrate. Found on those facts. And I think the facts, in many ways, kind of illustrate the distinction and why it's properly applied here. In Comer, you had a participant in an ERISA plan who was suing the plan trustees and the brokerage, Smith Barney, and there were no claims that were founded on the agreement between the trustee and the brokerage that contained the arbitration clause. Entirely unrelated to that agreement, there was an investment agreement. It had an arbitration clause. That agreement was only between Smith Barney and the plan trustees. Comer was a participant suing under ERISA for essentially damages to the plan participants. No claims founded on the contract. Here, that you read this complaint, the allegations are all tied to and founded upon the master construction agreement. You failed to pay BBC timely, put us in financial straits, causing us damages. You promised to provide BBC with more work under the MCA. You didn't do that. You've damaged us. You made representations about how quickly you were going to pay BBC for work that BBC was providing under the MCA. You have damaged us. All the claims that are asserted by the non-signatory plaintiffs here are founded upon, are based upon, in one way or another, that master construction agreement. And on those facts, direct benefits estoppel squarely applies, and the district court so held. The final issue, and it wasn't addressed by counsel, but I'll touch on it here in my few minutes remaining, the Beals argued that even if the claims were arbitrable, which indeed they are, and even if the court were to find that they were bound to arbitrate those claims under equitable estoppel, that somehow that the court should essentially deny enforcement of the arbitration clause under either Greentree's prohibitive cost analysis or unconscionability. Again, I think the district court properly found, one, that the Greentree prohibitive cost analysis applies only to Federal claims, Federal statutory claims, and that the proper analysis of unconscionability is based on State law. Applying Arizona State law to those claims, the decisions squarely indicate that the AAA fee schedule on facts very similar to those presented here are not unconscionable. AAA provides for deferment, waiver, apportionment of fees, and on those facts, they're not unconscionable. Just one question on the estoppel. You said they have to arbitrate their claims, but you're not really saying they have separate claims. They're estopped. What are they estopped to do? They're estopped to deny that they're bound to arbitrate those claims, whatever claims they may have. I agree with the comments from the bench at the very outset. These shareholders have no standing to assert those claims, and when, if this district court decision is upheld, the next decision for the arbitrator, again, the corporation is arbitrating the identical claims in AAA in arbitration. They've moved those claims. They haven't appealed the district court's decision that the corporation is bound to arbitrate these very same claims. So now, if the district court decision is upheld and the non-stigmatory, these individual shareholder plaintiff's claims are moved over to arbitration, the next step and the next issue is, do they have standing to bring them? And our position is that they do not. Okay. Thank you. Thank you. Thank you, Your Honors. And following up to the Court's inquiry, I think the notion that this is a new representation with new consideration is precisely the point. And that's why this case is analogous to the First Circuit's Intergen v. Greena case, which involved extra-contractual representations made to Intergen, which was the wholly-owned subsidiary of the contracting parties. And the Court in that case said, we're not going to compel Intergen as a non-stigmatory to arbitrate under equitable estoppel grounds. And that's the same scenario we have here. The comments that counsel made very briefly on the issue of prohibitive expenses, that arises from the U.S. Supreme Court's in Greentree, where the U.S. Supreme Court's concern is making sure that the forum, the arbitration forum, is accessible. And if it's not accessible, then it will be the agreement to arbitrate would be unconscionable such that it could not be enforced. And that's what the record before the district court established in this case. The record in the district court established that the Beale brothers would have to pay $8,000 in initial filing fees, $3,250 in initial case service fees, and then be responsible to pay half of a three-arbitrator panel for their time to arbitrate the dispute because this was a large commercial matter. And those fees, Your Honors, are prohibitive, and they deny access, and as such, it should be deemed to be unconscionable and unenforceable. Thank you very much for your time. Thank you. Thank you, counsel. The case just argued is submitted for decision. We'll hear the next case, which is Alameda v. Barnhart.
judges: Schroeder, Graber, Duffy